In the Matter of CHARLES D. SPRUNG, an Attorney.

First Department, May 29, 1930.

*Isidor J. Kresel* [*Earl B. Barnes* and *Irving Ben Cooper* with him on the brief], for the petitioners.

*Stanley C. Fowler* of counsel [*Ralph O. L. Fay* with him on the brief; *Fowler & Fay*, attorneys], for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law on July 1, 1921, in the New York Supreme Court, Appellate Division, First Department.

The charges of misconduct as an attorney and counselor at law made against the respondent herein are a result of the Ambulance Chasing Investigation. The principal charge against him is that he participated in a scheme and conspiracy to defraud insurance companies by the assertion of baseless claims for personal injuries

and property damages alleged to have been sustained by the negligence of certain corporations covered by indemnity insurance. Charges of improper solicitation and improper subscription as a notary public of certificates of acknowledgment are incidental to the principal charge. Respondent's answer to the petition alleges that he acted in good faith in connection with claims asserted against insurance companies, as set out in the petition, and denies any and all allegations charging him with acts of wrongdoing or dishonesty.

The matter is now before this court on a motion to confirm the report of the referee to whom the matter was referred to take testimony in regard to the charges and to report the same with his opinion thereon to this court.

Respondent is in his present difficulty because of his association with Daniel M. Laulicht and Benjamin Laulicht. He first met them in December, 1924, through one William Weiss. There is testimony that Daniel M. Laulicht had, for some years prior thereto, been engaged in the laundry business, working for others, and also for himself and his brother under the corporate name Pure Wet Wash Laundry, in Coney Island. Respondent's version of the meeting with Daniel M. Laulicht is that Laulicht sought to be represented by respondent in connection with a matrimonial proceeding to which he, Laulicht, was a party. In this he is supported by Weiss. Laulicht, however, testified that, having no occupation, he asked Weiss if he knew of anything he could do and Weiss suggested to him that he do what he (Weiss) was doing at the time, and later introduced him to respondent, saying, "Well, Charley, this is a friend of mine just quitting the laundry business and he is O. K.; he will run around and try to get some cases and give him some summonses and whatever cases you get." Laulicht further testified regarding this introduction as follows: "Then I asked Mr. Sprung what my share would be if I brought cases and he said 'You will get one-third of my fee, the same as Weiss.'" The subsequent developments compel acceptance of the Laulicht version of the first meeting between respondent and the Laulichts. Respondent's own testimony is that between December, 1924, and July, 1925, these Laulichts brought him twenty-one matters, some of them involving as many as four distinct claims for personal injuries. Among those were the claims which are the basis for the charges herein.

Soon after this meeting Daniel M. Laulicht testified that he had a conversation with respondent. His version thereof is as follows: "I told Mr. Sprung I wasn't making any money, and it didn't pay to hang around and he said, 'Why don't you do what the other fellows are doing.' I asked 'What did they do?' and he said 'Go

out and get some company to frame up a case with you. I can settle it.' I said ' Who do you suggest? ' He said ' I can get money off the Ocean Accident Company.' He said ' I can get money from the Ocean Accident Company about ten days after the report goes in.' I said ' I don't understand what you mean, because it is the first time I ever heard anything like that.' So Mr. Sprung explained to me that the Coney Island Wet Wash Laundry Company was insured with the Ocean Accident Company and the fact that I was in Coney Island at one time and had a laundry there, I should know some of the drivers working for the Coney Island Laundry. I said, ' Yes, I know practically all of them.' He said, ' Wouldn't it be possible for you to go out there and have the drivers put in a report and state he had an accident? ' I said ' I guess I could have it.' He sat down and figured what sort of action should be put in. Then I went to Coney Island — Q. Wait a minute. What do you mean by ' he sat down and figured what sort of action should be put in? ' A. Mr. Sprung outlined to me just what the driver should report to his employer. Q. What did he say the driver should report? A. I don't remember the correct details, but that it would be four or five people sitting in a taxicab, and as the driver was rounding the corner his horse should run into the taxicab and claim he had injured the people. Q. Yes. A. And then the driver should report this to his employer. Q. That is, you were to obtain this report? A. I was to get the driver to put the report to the company. Q. To have the driver put in a report of an accident that never in fact occurred? A. Yes."

The record contains evidence of the following claims of the character described in the foregoing testimony:

The Roman Wet Wash Laundry: An alleged accident December 27, 1924, at Ninth street and First avenue, New York city. A horse and laundry wagon were alleged to have collided with a taxicab in which William Lehman, Fred Polish, Sylvia Deutsch and Rose Deutsch were alleged to have been riding. A claim letter was written by respondent December 30, 1924, and settlement was made January 9, 1925, by the indemnity company.

The Flower Wet Wash Laundry: An alleged accident December 23, 1924, at Delancey and Ridge streets, New York city. A horse and laundry wagon were alleged to have collided with a taxicab in which Rachel Katzman, Morris Bank, Jack Hirsch and Lillian Lehnsman were alleged to have been riding. A claim letter was written by respondent December 31, 1924, and settlement was made January 17, 1925, by the indemnity company.

The Coney Island Laundry Company: An alleged accident January 6, 1925, at Surf avenue and Twenty-fifth street, Coney

Island. A horse and laundry wagon were alleged to have collided with a taxicab in which William Grill, Sylvia Grill, Jack Hirsch and Lillian Larisman were alleged to have been riding. A claim letter was written January 14, 1925, and settlement was made January 24, 1925, by the indemnity company.

The person described as Lillian Larisman in the claim against the Coney Island Laundry Company is the same person described as Lillian Lehnsman in the claim against the Flower Wet Wash Company. She now is the wife of Jack Hirsch named as one of the injured in both claims.

These alleged laundry wagon collisions never occurred. The name of the driver of the Roman Wet Wash Laundry appears as Louis Kornfeld. Benjamin Laulicht, Daniel's brother, is the driver making the fraudulent report in the Flower Wet Wash Laundry claim. Sol Rosenfeld testified he was induced to fraudulently report an alleged accident to his employer, Coney Island Laundry Company, as testified to by Daniel M. Laulicht. Requests for medical examinations of the alleged claimants were met by having various individuals pose as the injured claimants. These examinations were held in the presence of respondent. Following the settlement releases were executed. Each of the twelve releases in the laundry cases bears the signature of the respondent as witness to the execution thereof, and each bears his name as the notary public before whom each claimant purported to have appeared and acknowledged his or her signature. Testimony by the Laulichts as to their execution of many of the releases is supported by the testimony of a handwriting expert. Respondent's figures on the settlements show that in two instances Hirsch received more than his proportionate share. Hirsch testified that neither he nor his wife was injured in any accident; that they never employed respondent to make a claim for personal injuries, never submitted to physical examinations in connection with any accident or alleged accident either at respondent's office or at any other office; that the signatures on the releases and statements are not those of himself or his wife; that they never received any money from respondent. Hirsch admitted having met respondent, saying: " I was introduced to him and spoke to him about two minutes, and that's all — spoke about things in general, and that's all." The other alleged claimants were not produced. Fred Polish, one of the claimants in the Roman Wet Wash Laundry case, was also known as Irving Goldfarb. Lehman is apparently non-existent. Rose Deutsch is now the wife of Benjamin Laulicht, and Sylvia Deutsch is her sister. Rachel Katzman and Morris Bank, two of the alleged claimants in the Flower Wet Wash Laundry case, are non-existent. There is testi-

mony that Daniel Laulicht posed as Bank for the purpose of the requested physical examination. The Grills, alleged claimants in the Coney Island Laundry Company case, are non-existent.

The presentation of fraudulent claims was not limited to laundry companies. On January 26, 1925, on Sixth avenue near Twenty-second street, New York city, an automobile truck collided with a south-bound trolley car. Several passengers were injured. Daniel Laulicht witnessed this accident and tried, without success, to obtain retainers from some of the injured. Laulicht told respondent of the accident and of the proposal of another attorney to assert fraudulent claims based on the information obtained by Laulicht. Laulicht's testimony is that this other attorney had urged the desirability of having more than one office assert claims so as to allay suspicion because of the absence of the fraudulent claimants' names from the police and conductor's list. The following is an extract from Laulicht's testimony: " I explained to Mr. Sprung what the accident was and asked what he thought of it, and he said ' I will take a chance if you can put two people on that are really living so that when the investigator comes around and speaks to them they will at least say that they have an attorney and were in the accident.' He says ' I will only take it if you can fix up those people to say that.' They I says ' I can fix up two people to say that.' He said ' Who are they? ' I said ' I know Jack Hirsch and I know Irving Goldfarb.' " On February 19, 1925, respondent asserted a claim on behalf of Irving Goldfarb and Jack Hirsch against the New York Railways Company for injuries alleged to have been sustained on January 26, 1925, while riding in the automobile truck alleged to have been struck by the railways company's Sixth avenue car No. 1316 on Sixth avenue between Twenty-second and Twenty-third streets. The claims were settled on April 17, 1925. Hirsch's testimony, referred to in connection with the laundry cases, is also applicable to this case. Goldfarb was described as being the same individual named as Fred Polish in the Roman Wet Wash Laundry case.

Respondent meets these charges with protestations of innocence. He testified that Laulicht brought the cases to him because he, Laulicht, had been impressed with his work. The first laundry claim letter was written December 30, 1924. The second was written December 31, 1924. Respondent testified that on December thirty-first, while reporting the second laundry wagon accident, Laulicht brought up the subject of the case he had recommended the day before. Respondent testified: " He asked me whether he was going to get anything out of it, any rake-off. I said ' What do you mean? ' He said, ' Well, I recommended a case to you, I

ought to get some money; I had gotten one-third from other lawyers, and you ought to pay me the same for recommending cases.' I said, ' I don't pay any rake-off,' and I would not make any exception with him. I appreciated that he recommended a case to me, but I could not pay him anything for bringing it. * * * He suggested that — and passed it off at the time and said he would see his clients and maybe he could get it from his clients."

Had respondent had any illusion regarding Laulicht, that conversation should have been sufficient to disclose what he really was. Notwithstanding this, respondent's testimony is that Laulicht continued to recommend cases to him, and he continued to accept them.

Within a period of two weeks respondent had three laundry matters. In each of them there were four claimants, occupants of a taxicab, involved in an accident, a collision between a taxicab in which the claimants were seated and a laundry wagon owned by different laundry companies. In each case the claimants were two men and two women. Respondent's testimony is that Laulicht brought two cases one day after the other, and the third within two weeks. He testified that he regarded it as remarkable that two such cases should be brought to him one day after the other, but he did not think it suspicious when the third laundry case was brought to him. When the first matter was brought to him he testified that he did not know any of the claimants, yet he wrote the claim letter; the next day, as in the first matter, he wrote a letter on behalf of the four claimants (whom he testified he did not know) without any communication with them and without any investigation; and in the third matter, he wrote the claim letter, as he testified, without any investigation or attempt to communicate with the alleged claimants. He must at least have been familiar with the names and the dates of the alleged accident. In the third case we find him asserting a claim on behalf of two of the individuals involved in the second case, Jack Hirsch and Lillian Lehnsman. On December thirty-first he claimed these two had been injured on December twenty-third, and on January fourteenth he claimed they had been injured on January sixth, both times while passengers in a taxicab which collided with a laundry wagon. The change in the name from Lillian Lehnsman on December thirty-first, to Lillian Larisman on January fourteenth, simply emphasizes the fraud.

The referee said: " It is inconceivable to my mind to accept as true the respondent's contention that these three cases were accepted by him in good faith. The most simple-minded person, let alone an attorney of several years' practice, must have known that three such accidents of exactly the same kind, with the same number of

men and women involved, did not happen within a span of a few weeks."

After the claim letters were written, the next step seems to be the procuring of medical certificates. The same doctor signed certificates in the first and second laundry matters. A different doctor signed the certificates in the third laundry matter. It is significant that these doctors' offices are located on the lower East Side, while the home addresses of the claimants are far distant, some in The Bronx and others in Brooklyn. Respondent found nothing remarkable in this. There is testimony that certain doctors freely furnish medical certificates for these fraudulent claims. The referee said: " Though I am convinced that the medical certificates were issued by the physicians with the knowledge that they were fraudulent  *  *  *, it is beyond the province of this report to enter into the details of the evidence involving them."

In each case the physical examinations, the signing of the statements, the execution of the releases and the settlements took place at the same time. Laulicht's testimony is that Weiss (who had introduced him to respondent) produced the people to submit to the physical examination. This is denied by Weiss as well as by respondent. The evidence shows that Laulicht signed Polish's signature to the statement and the release, and Lehman's signature to both of these papers in the Roman Laundry case. He also signed the names of Morris Bank and Lillian Larisman to the releases in the Flower case, and those of Sylvia Grill and William Grill to the statements and releases in the Coney Island case. The report of the referee states: " There is not a shadow of a doubt about these forgeries. A casual comparison of these signatures with specimens of Laulicht's handwriting shows that Laulicht was telling the truth. In addition, we have the testimony of the handwriting expert, Mr. Haring, to that effect. The learned counsel for the respondent does not deny the correctness of Mr. Haring's opinion." There also is the testimony of Hirsch denying that either he or his wife signed the papers attributed to them. Yet respondent testified that the various statements and releases were signed in his presence by the parties who posed as claimants. Upon being confronted with the testimony of Laulicht and the handwriting expert, he testified that he handed the releases to each claimant to sign and he saw them sign something, he could not say positively whether they signed releases or statements, or something else; that he did not see Laulicht sign any of the papers, although it was possible for him to do so, for, respondent testified, " the room was small and they were all crammed around together. The investigator was there and the four people were there, and the two brothers [the Laulichts] were there. I didn't detect any fraud."

The referee said: " If the respondent's testimony * * * stood alone, it would be sufficient to convict him. His explanations, if they can be thus called, are utterly futile, and imply an insult to one's intelligence. Picture the situation and the actual facts. In the Roman case Laulicht forges the names of Polish and of Lehman; in the Flower case Laulicht forges the names of Bank and the Larisman girl, and Hirsch did not sign the papers bearing his name; in the Coney Island case Laulicht forges the names of Sylvia Grill and of William Grill, and Hirsch did not sign the papers bearing his name. And in the face of this we have the contradictory testimony of the respondent and his halting version wrung from him by his counsel, which is to serve as his acquittal from any wrong. Upon the uncontrovertible facts, or even under the conditions outlined by the respondent, it is beyond the range of probability, or even possibility, that respondent should have believed that the four spurious claimants in the Roman case had signed the various papers and that he, in good faith, witnessed their signatures and took their acknowledgments as notary public; that the same proceedings in all their details were repeated in the Flower case, and again repeated in the Coney Island case. It is quite apparent that the description of the scenes at the signing of the papers and the final repudiation of his previous testimony concerning the Coney Island case signatures were due to the realization of Laulicht's corroboration by the handwriting expert. With this in mind the respondent could no longer maintain that the signatures of the claimants were genuine and he had to make his last stand with the assertion that though the claimants may not have signed the releases, they acknowledged their signatures to him. No adequate reason was given or could be given why these apocryphal claimants should have balked at signing their names while ready and willing to acknowledge false signatures as their own."

The indemnity company checks given in settlement were indorsed by the persons who signed the statements and releases.

The accident leading to the assertion of the claims against the New York Railways Company occurred on January 26, 1925. That day respondent testified he delivered to Jack Hirsch the check received from the insurance company in settlement of the claim against the Coney Island Laundry. Jack Hirsch was named as one of the claimants against the New York Railways Company. That made three claims in the name of Jack Hirsch in a little more than a month, two against laundry companies and one against the railway company. Respondent testified that Hirsch with Irving Goldfarb, the other claimant against the railway company, came to his office without either of the Laulichts; they gave him the par-

ticulars of the accident in which they said they had been involved and he wrote a letter to the New York Railways Company. Later when it became necessary to obtain signed statements from the claimants, respondent sent Daniel Laulicht to have the statements, which he testified he prepared from information obtained from Hirsch, signed by Hirsch and Goldfarb. In the Hirsch statement in this instance his occupation is given as boss plumber. In the Coney Island Laundry case his occupation is given as manager for E. Baum, 432 Houston street. When the offer of settlement was made, he sent Laulicht to Hirsch and Goldfarb to find out if they would accept the offer. The releases were sent to them, Laulicht being the messenger, and Laulicht brought back the releases executed and acknowledged before Laulicht as commissioner of deeds. When respondent went to the railway company's office to obtain the checks in exchange for the releases, one of the men there noticed the releases had not been witnessed, and respondent signed his name as witness. Before Mr. Justice WASSERVOGEL in the Ambulance Chasing Investigation his testimony is that Hirsch had signed the release in his presence. Hirsch denies any participation in this matter. Goldfarb is dead. Laulicht's testimony is that he and his brother signed the releases, and then at respondent's suggestion he signed the acknowledgment as commissioner of deeds, so as to have it appear that the client came up and signed in front of respondent and then respondent had taken the client out to a different office to have it notarized.

The referee said, regarding the claims against the railways company: " The self incriminating evidence of the respondent is not as strong or convincing as in the three laundry cases, and if this case stood alone, I should be inclined to find the petitioners' proof insufficient. But the respondent's participation in the prior frauds and his unholy connection with the Laulichts lead me to the conclusion that the suspicious and irregular acts admitted by the respondent unmistakably establish his guilt, irrespective of the testimony of the Laulichts." Then, after analyzing the testimony, he proceeds: " I am constrained to reject the respondent's defense. His evidence does not bear the mark of truth. There are too many suspicious circumstances involved in his testimony that required satisfactory explanations which were not forthcoming. One incident taken by itself may not prove anything, but we are met with a series of extraordinary and unusual happenings which, taken together, establish the respondent's guilt. Can it be said that a satisfactory explanation was given why the respondent should have written the claim letter without getting sufficient information from his clients about the accident, why the fact that

Hirsch had been hurt in three accidents within a month did not arouse his suspicion, nor that the accident happened on the same day that Hirsch received the Coney Island check, why he should have on two occasions transmitted papers for execution by his clients through Laulicht, why he should have prepared the releases with the amounts of the settlements stated therein before knowing whether it would be satisfactory to his clients, why he did not notice the discrepancy as to the occupation of Hirsch, why he witnessed the signatures to the releases (a highly improper proceeding in itself), why he gave testimony before Justice WASSER-VOGEL contradictory of that on this hearing, why he paid the shares of Hirsch and Goldfarb in cash, why he has no receipt or any other evidence of payment, why he paid Hirsch the full one-half of the settlement without deducting the alleged excess payments in the Flower and Coney Island cases?

" If we add to all this the damning evidence of the Laulichts and Hirsch, the charges of the petitioners have been overwhelmingly established."

There was also a claim against the Fox Folly Theatre which grew out of a fall by one Wertheimer, arranged, according to Laulicht's testimony, by Laulicht at respondent's suggestion. The claim was made in the name of Harry Sarnick. Speaking of this claim, the referee in his report said: " Although the conduct of the respondent in this matter is not free from suspicion, the proof is not sufficiently clear to find the respondent guilty of the heinous offense charged by the petitioners." The petitioners apparently acquiesce in the conclusion of the referee as to this claim as no attempt is made on this motion to establish the contrary.

The record of the Laulichts is well known to this court. They were members of a group engaged in the business of prosecuting fraudulent claims. As a result of the Ambulance Chasing Investigation, many of the group have been convicted of felonies. Association with the Laulichts and their fellow-conspirators has meant professional ruin for a number of attorneys. When respondent first came in contact with them he had been admitted to the bar and engaged in active practice for more than three years. His prior experience would indicate knowledge of the ways of the world. We cannot believe that respondent was unaware of the category to which the Laulichts belonged. The conversation with Daniel Laulicht in which Laulicht asked for a " rake-off," thus disclosing himself as a " runner," would have been enough for the most inexperienced attorney. Yet for eight months thereafter respondent continued in the closest association with him. And the testimony would seem to indicate that the relationship did not end then.

On the testimony of the Laulichts alone, respondent could not be found guilty. His own testimony, however, coupled with the documentary proof and the other testimony in the record, sustain the conclusion of the referee that " the charges of the petitioners against the respondent, except in the Fox Folly Theatre case, have been in all respects established not merely by a preponderance of evidence but beyond a reasonable doubt."

The learned referee, who tried this proceeding with eminent fairness, care and ability, reports that " I doubt whether this Court has ever had before it a proceeding of that kind [disbarment] where greater depths of iniquity were sounded than in this. And I am compelled to find, disheartening duty though it may be, that the petitioners' charges have been sustained."

With the finding of respondent's guilt we find ourselves in full agreement. The respondent should be disbarred.

FINCH, McAvoy, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.