In the Matter of MORRIS H. KATZ, an Attorney.

First Department, June 6, 1930.

*Isidor J. Kresel* of counsel [*Harold Harper* and *Irving Ben Cooper* with him on the brief], for the petitioners.

*John P. Cohalan*, for the respondent.

DOWLING, P. J.   The respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term of the Supreme Court of the State of New York, Appellate Division, Second Department, on April 4, 1923.

The petition charges that respondent has been guilty of misconduct as an attorney at law in the improper solicitation of retainers from persons having claims for personal injuries, and in the presentation, prosecution and collection of fraudulent claims for personal injuries and property damage alleged to have been sustained. A supplemental petition charged misconduct in that he commenced actions in the Municipal Court of the City of New York, Borough of Manhattan, Second District, and issued and filed summonses in such actions in which he falsely and fraudulently misstated the addresses of the respective plaintiffs in order to deceive and mislead the court and the defendants to whom the summonses were addressed.

The matter is now before the court on a motion for such action as the court may deem just and proper, following the filing of the report of the learned referee to whom the matter was referred

to take testimony regarding the charges and to report the same with his opinion thereon to this court.

On the charge of improper solicitation it appears that following his admission, in 1923, he had no negligence cases during that year. In 1924 he had about 30 accident cases; in 1925 he had 82; in 1926 his business jumped to 533 cases, and in 1927 he had 1,193. With few exceptions, the actions were brought in the Municipal Court of the City of New York, Borough of Manhattan, Second District. Respondent's testimony is that he represented garages catering almost exclusively to taxicab owners, taxi owners associations, a co-operative association composed of installment dealers, several coat and apron supply laundries, and other associations; that the suits were mostly by chauffeurs, members of these various associations. He testified that his various clients came to him without solicitation, except some of them were recommended by various taxicab people, friends of theirs, or the owners of garages, or his cousin in the insurance business who wrote their business for them, but outside of that nobody ever solicited them; further, " I want to say this, that the average settlements in the cases were nominal, so much so that they just barely paid a little over and above the actual disbursements and the time and the help and whatever I had in the office; very many of them were for small property damage claims, and many of them were for a greater amount." Other than showing the numbers of actions instituted, no attempt was made by petitioners to controvert respondent's denial of solicitation. The referee states in his report: " This statement [that the business came to him without solicitation] was not controverted by the petitioners, and although the fact of so many suits brought by a young lawyer, who had only been practicing law two or three years, is very suspicious, yet in view of an uncontradicted explanation, which on its face is plausible, I feel bound to report that in my opinion the charge should be dismissed for want of sufficient evidence to support it."

On the false address charge, the record shows it was the custom in the respondent's office to put upon the printed summonses, under the heading left in blank for that purpose " Plaintiff's Address," addresses without regard to whether it was the true address or not. The testimony is that some of the addresses used were those of public schools, a private hospital, a parochial school, loan office, commercial buildings, vacant lots, and many were purely fictitious. Miss Helen Turkfield, who testified she was in respondent's employ as a stenographer from 1916 to 1930, gave the following testimony: " * * * When I first started working for Mr. Katz this girl Shirley told me to bring the cases in the Manhattan Second District

because most of the clients lived in the Second District, and Shirley had said I was to bring all the cases in the Second District Court. I said: ' If the plaintiff lived in Brooklyn, where shall I bring the action? ' She said, ' Give any address as long as you bring it on the east side.' The clerk usually looks to the summons. I didn't ask any other question, but I just did that and didn't question it. * * * By the Referee: Q. You want me to understand that Miss Shirley told you in putting down the addresses on these summonses to put any address there so long as it was within the Second Municipal District? A. Yes. Q. Without regard as to whether it was a true address or not? A. Yes. Q. She told you that, do you say? A. Yes."

When respondent in August, 1928, knew that this witness had indulged in these practices, he continued her in his employ for nearly a year, the blame being placed on Miss Shirley's instructions to her.

Respondent's testimony is that he did not examine the summons to see what address was given to show the plaintiff's address; that was mere routine in the office and was left to the clerk and the girl. He offered no better explanation. The following is an extract from his cross-examination: " Q. Now I ask you whether you consider it an honest thing to have said to the Municipal Court that John Jones lived at one address, whereas in truth and in fact he lived at another? Do you consider that honest or not? A. I don't consider it dishonest. I don't see where it prejudices anybody. Today the Municipal Court have jurisdiction — Mr. Harper: I move to strike out the last part of the answer. Motion granted."

The referee stated that he could not avoid the inference that in resorting to false addresses on the summonses respondent's employees were acting under the instructions of respondent, who, upon his own statement, did not see anything dishonest in such misleading of the court. The referee said: " Even if he did not give such instructions I am unable to see how such a reprehensible custom could have been carried on for years without his knowledge." This court cannot believe that respondent was unaware of what was being done. The provisions of the Municipal Court Code entitle a defendant to have a case moved to the district where he resides or has his place of business, if the action is commenced in a wrong district. It is presumed that respondent knew that. Whatever the motive was, respondent cannot escape responsibility for the deception practiced upon the court and the defendants in the actions by feigning ignorance of what was being systematically done in his office.

As to the charges involving the presentation, prosecution and collection of fraudulent claims, the report of the referee covers two

instances, which he designates as the Scheiner case and the Yellow Taxicab fraud.  As to these, the record shows:

(1) The Scheiner case.  In January, 1925, respondent instituted an action in the Municipal Court of the City of New York, Borough of Manhattan, Second District, entitled Harry Scheiner against the Coney Island Laundry Company for $1,000 damages for personal injuries alleged to have been sustained as the result of an alleged collision between the laundry company's horse and wagon and the taxicab which Scheiner was alleged to have been operating.  The defendant answered.  A physical examination was held at respondent's office.  Respondent negotiated for a settlement and finally settled with the insurance company interested for $75.

Respondent's testimony is that early in January, 1925, his clerk, Charles Forschleiser, told him that, while he was out of his office, a man by the name of Scheiner had called, said he had been recommended, and gave particulars with reference to an accident in which his taxicab was involved with a truck belonging to a Coney Island laundry.  Forschleiser gave him a memorandum (which respondent was unable to produce).  Respondent instituted suit.  Some months after the representative of the insurance company asked if he would agree to settle the matter for seventy-five dollars.  Respondent wrote Scheiner at the address given on the Forschleiser memorandum.  Scheiner did not reply.  In the fall of 1925 he made inquiry of one Kaplan as to whether he knew a man named Scheiner.  While engaged in conversation with Kaplan, one Laulicht came up, injected himself into the conversation and said he guessed he knew Scheiner and thought he had recommended him to respondent.  Laulicht said if he saw Scheiner he would send him up to respondent.  In the latter part of November a man called at respondent's office and his clerk reported to him that there was a man by the name of Scheiner waiting to see him.  Respondent had never met Scheiner.  Respondent's testimony then proceeds: " He said his name was Harry Scheiner and that some of his friends told him his case was settled.  I said, ' Not settled, but I had an offer and that depends on you.  Where have you been all this time?  You haven't been in New York.'  He said, ' Well, I just came back recently and I was up State.'  And I said, ' What were you doing there? '  He said, ' When I was up there I was so sick, I couldn't do anything.'  I said, ' That didn't prevent you communicating with me.'  He said, ' What is the difference?  Give me my money.'  I said, ' You can't get your money.'  He said, ' Well, call up the company and tell them to give me my money.'  I said to him, ' To be frank with you I never saw you and I don't recollect you.'  He got into an argument with me and he said, ' You know I saw

you before.' I said, ' I don't recollect you or having seen you before.' He said, ' Ain't you the man I gave the case to? ' I said, ' No, I don't remember you.' I said, ' Maybe I am wrong. Haven't you got anything to show that you are Scheiner? I don't recollect you.' He started to browse around in his pockets and tried to find something and found a little paper that was just clipped into something there. I said, ' What is that? ' He said, ' That is a memorandum that I got into an accident.' I didn't know what to do and I went into one of my associates and I told them about this case and about this man's conduct and that I didn't know him, and they said, ' If he has got the particulars and if he knows, you can quiz him as to the particulars and if he gives you the right particulars you can be certain he is the man.' I went back. That was right next door. I started to talk to this fellow. He said he would give me all the particulars and as a matter of fact he gave me more data than I actually had on my own paper there. He gave me the chauffeur's number and the wagon number of the Coney Island Laundry Company and direction in which he was going and the other vehicle was going. And after that talk with him I called up the man from the insurance company and I told him, I said I have this man Scheiner in the office and that I had quizzed him and got the facts in the case and I am preparing to do anything he wants to do. He says, ' Well, if the fellow gave you the facts of the case you ought to be certain he is the man.' I said, ' Well, I am quite certain.' He said, ' Why ain't you going to do this? Play safe, and get him to embody that in an affidavit and give me a copy of it and you have the affidavit; and by the way send him down to me, and I will talk to him myself. I will interrogate him.' I said, ' That is satisfactory to me,' and I drew this affidavit. It was not an affidavit, as Laulicht said, that there was an accident. It was an affidavit that stated only the date the accident had occurred and he gave me a new address, 610 East Sixth Street, four hundred and something. All this I embodied in the affidavit and then drew the release and he signed the release and acknowledged the release. * * * I took his signature and swore to it. * * * I didn't take the affidavit. My associate took the affidavit. * * * I told him that the man from the company stated he would like to interview him, and he said ' I will go right now.' I gave him the releases, the duplicate and the original and the affidavit, and he went down there. Before he went down he said, ' Do you think I will get a check right away? ' I said, ' It may take a few days or a week.' He said, ' I will ask them.' He went down there. I didn't hear from them nor him until about a week or some time thereafter, when I got a check from the Ocean

Accident Insurance Company for the sum of $75. That check was made to my name and to his name jointly. I think a day or so later he called at my office and I told him I had the check and he signed his name to the check and I gave him my check." The man who appeared at respondent's office and executed the release, as described in respondent's testimony, was Irving Fuhr. Fuhr testified that he first went to respondent's office on the direction of Daniel Laulicht who had told him of overhearing a conversation in a restaurant. Laulicht gave him the facts on a piece of paper and he, Fuhr, studied them.

George Stone Jarrett, chief adjuster for the Union Indemnity Company, formerly with the Ocean Accident and Guarantee Corporation, identified the report of Dr. Robert James Bell, covering the physical examination of one Henry Scheiner at the office of respondent on March 9, 1925. The report states that respondent was present. Jarrett testified that the case had been assigned to him and he called respondent's office on the telephone and discussed a settlement for seventy-five dollars. He placed the matter in his settled file on his desk. The release did not come in for a month or five weeks and then he called respondent's office on the telephone and asked for respondent. Jarrett's testimony of the telephone conversation is as follows: " The conversation was with the person that I spoke to at the attorney's office, that they hadn't heard from the client, they didn't know where he was, they thought possibly he might be dead. So I wrote a little memorandum in my file as a safeguard. If the man was not dead I wanted an investigation, and, if he was dead, to check it up and get a death certificate if possible. So the investigator in his report said there was no death certificate; he could not find any. So the thing dropped then for the time being until I should judge about three weeks or a month later, and the attorney then called me and he said he was Mr. Katz, and he said a client had just entered his office, and I said, ' Well, are you sure he is the man? ' He said, ' Yes.' Then I spoke to the investigator again and I asked him, ' Are you sure there was no death certificate? ' and that the man was actually living as far as they knew. I told him to get an affidavit from this man to the effect that he was the man and the claimant in this case." (He told this to respondent.) " That was the time Mr. Katz told me that the client walked into his office. So he took this affidavit and sent the man down to my office. I asked the man who he was and he said, ' Harry Scheiner.' I asked him if he had signed the affidavit and he said, yes, he had signed the affidavit. I said, ' We understood you were dead,' and he said, ' No, I have been up in the Catskills all summer ' or up in

Monticello, as he stated, ' driving a cab.' I said, ' Where do you live? ' He gave me an address, and I said, ' All right, I will mail a check to you.' He wanted the check then and I said, ' No, I will send it to the attorney.' I sent a man out to get the address of this man and there was a Scheiner living there. I mailed the check two or three days later. I mailed the check to Mr. Katz."

Daniel M. Laulicht testified that the Scheiner suit was instituted by respondent after the settlement by another attorney of the alleged claims of the occupants of the taxicab alleged to have been involved in the accident with the truck belonging to the Coney Island Laundry Company. These claims were fraudulent. (See *Matter of Sprung*, 229 App. Div. 501.) There was an individual named Harry Scheiner who owned and operated a taxicab. Laulicht's testimony is that the situation was explained to Scheiner and he actually submitted to a physical examination at respondent's office, at which, Laulicht testified, respondent was present. Thereafter respondent told Laulicht that he had an offer to settle the case for seventy-five dollars, and Laulicht told him to go ahead and settle it, as it was as good as could be had because Scheiner had died. (A certificate of the death of Harry Scheiner in May, 1925, was produced and is part of the record.) Laulicht arranged with Fuhr to pose as Scheiner for the purpose of executing the affidavit and release and so informed respondent. This arrangement was carried through and Fuhr executed the release and affidavit, and went to the insurance company's office, as was testified to by respondent, Fuhr and Jarrett, and the money collected from the insurance company.

There was produced a report of Dr. Robert J. Bell covering the examination of Scheiner. The report states that the examination was had " at office of M. Katz, 305 Broadway, New York City, March 9, 1925, 4 P. M., Mr. Katz, present." Dr. Bell is dead. His signature to the report was properly identified, and the proof was that the report came from the files of the insurance company, that the doctor was employed by the insurance company, and such reports were required by the company and made in the regular course of its business. Objection is made that the report is not properly admissible as proof of the statements therein contained. In *Leland* v. *Cameron* (31 N. Y. 115) the Court of Appeals said: " The rule of evidence applicable to entries made by deceased persons, is thus stated in 1 C. & H., note 675: that all entries or memoranda made in their course of business or duty by any one who would, at the time, have been a competent witness of the fact which he registers, are competent."

In *Fisher* v. *Mayor* (67 N. Y. 73) the same court said: " Entries made by third persons in the usual course of professional employment contemporaneously with the transaction recorded, are admissible to prove the fact stated, after the death of the person by whom the entry was made. (*Doe* v. *Turford*, 3 B. & Ad. 890, 898; *Brewster* v. *Doane*, 2 Hill, 537.) The entry by an attorney in his register of the making of an order or decree in a proceeding conducted by him, is admissible within this rule. The order or decree is the act of the court, but it is procured upon the application of the attorney, and the fact of obtaining it is a part of the history of the proceeding, which properly and usually is inserted in the register. There is no absolute duty resting upon an attorney to make such an entry, but this is not essential, it is sufficient, if the entry was the natural concomitant of the transaction to which it relates, and usually accompanies it."

We think that the report was admissible. Respondent denies that he was present at such an examination. That issue would be important only if we believed that he knew Scheiner was being impersonated by Fuhr and was a party to the fraud being perpetrated on the casualty company. If he in good faith believed that the man who appeared before him was Scheiner, his presence at the physical examination would have been material.

We find a conflict in the testimony as to details, between that given by Laulicht on the one hand, and respondent and Fuhr on the other. Fuhr corroborates respondent on the essential points in controversy. He admits impersonating Scheiner and asserts respondent's ignorance of the deceit. The learned referee, after analyzing the testimony of respondent and Fuhr and ignoring Laulicht's testimony in this particular case, reached the conclusion that respondent was a party to the fraud played upon the insurance company. While the transaction is highly suspicious and reeks of fraud, we do not believe the testimony is sufficient to warrant a finding of respondent's participation therein.

(2) The Yellow Taxicab fraud. In January, 1925, respondent instituted four actions in the Municipal Court of the City of New York, Borough of Manhattan, Second District, wherein the defendant was the Yellow Taxicab Corporation, and the plaintiffs were, respectively, Jack Hirshman, Benjamin Laulicht, Sophie Monshein and May Banks. The actions were eventually settled for a total of $125, which respondent received from the defendant therein. It is now beyond dispute that the accident alleged as the basis for such suits never in fact occurred; that the claims were fraudulent, and no injuries were sustained by the individuals named as plaintiffs. The only question is, Did the respondent knowingly participate in the fraud?

Respondent's story is that in November or December, 1924, he met the Laulicht brothers, Daniel and Benjamin. They engaged in serving processes for him. Later they introduced a man whom they named as Jack Hirshman, saying Hirshman was temporarily assisting them in their work. In January, 1925, Benjamin Laulicht and Hirshman came to respondent and told him that they, with one Sophie Monshein and May Banks (a sister or stepsister of the Laulichts) had been riding in a taxicab which had collided with another vehicle, and all had sustained injuries. Daniel Laulicht brought May Banks and Sophie Monshein to his office, and all four retained respondent. He instituted the four actions. On the request of the taxi company, physical examinations were had at respondent's office at which the four plaintiffs appeared and were examined. Thereafter the company offered $125, which was accepted, and, in due course, respondent received the check for the $125. His testimony is that the arrangements for the physical examination of the plaintiffs were made by him through Benjamin Laulicht; the offer of settlement was communicated to the plaintiffs through Benjamin Laulicht, who reported to respondent their willingness to accept the settlement; the releases were taken from respondent's office by Laulicht to be executed and acknowledged by the individuals named therein, and Laulicht later delivered them to the taxicab company signed in the names of the individuals named therein and with the certificate of acknowledgment signed by a person authorized to take acknowledgments. The Benjamin Laulicht release purports to have been executed in the presence of respondent, who signed the certificate of acknowledgment as a commissioner of deeds; two of the other certificates are signed by one Louis Tindler, and one by Abraham Pindek, as commissioners of deeds. Miss Kate Newman, the stenographer in respondent's employ in 1925, gave testimony corroborative of that of respondent. It is respondent's contention that he knew nothing whatever about the fabrication of the claims.

The testimony of Daniel Laulicht is that soon after he met respondent he explained to the latter his ability to " frame " cases; that before the actions against the Yellow Taxi Corporation were brought Laulicht had a conversation with respondent, the substance of which was that Laulicht was to see that a report was put in by a driver of a yellow taxi of an accident which never in fact occurred. Through introduction by one Jack Hirsch, a driver was induced by Laulicht to make a fraudulent report. Laulicht had a conversation with the taxi driver in which he outlined to the driver the facts, previously prepared between respondent and Laulicht, which the driver was to report. The report was made. Thereafter

the actions were brought. Laulicht, pursuant to an arrangement between himself and respondent, obtained from a doctor false certificates covering injuries alleged to have been sustained in the " accident." It is Laulicht's testimony that when the physical examinations were had respondent gave the doctor all the information as to loss of services, how much time they were laid up, how long they laid in bed, and what else would go with it. Laulicht testified that the individuals submitting to the physical examination were not the same individuals named as plaintiffs. The releases were signed at respondent's office, according to Laulicht, who testified that Benjamin Laulicht signed the one in his own name, and he, Daniel Laulicht, signed the releases in the name of Jack Hirshman and Sophie Monshein. He had no recollection as to who signed the May Banks release, but respondent took the Hirshman, Monshein and Banks releases to the office of Louis Tinkler, in the same building, and Tinkler signed the certificate of acknowledgment on the Hirshman and Monshein releases, and Abraham Pindek, Tinkler's office associate, signed the certificate of acknowledgment on the Banks release, but refused to sign as having witnessed the execution thereof.

Abraham Pindek testified that he took the acknowledgment of a person who was introduced to him as the individual named in the release; the details of the introduction, or who introduced him, he was unable to recall. He contradicted Laulicht's testimony.

Jack Hirsch gave testimony generally corroborative of that of Daniel Laulicht. He testified that he introduced the Laulichts to one Benjamin Reisman, a driver of a taxicab for the Yellow Taxi Corporation. He denied talking with respondent about a case against that corporation and testified the first time he learned of an action started by respondent in the name of Jack Hirshman against the Yellow Taxi Corporation was at the hearing before Mr. Justice Wasservogel in the Ambulance Chasing Investigation. Hirsch testified the Laulichts introduced him to respondent in 1925 and respondent knew and addressed him as Hirsch. Hirsch further testified that, at the request of the Laulichts, he submitted to a physical examination at respondent's office, and gave the doctor such information as the Laulichts had told him to; that respondent was present and answered most of the questions asked by the physician.

Sophie Monshein testified that she did not know respondent, had never been to his office, had never submitted to a physicial examination at his office, and had not been involved in the accident in question.

The testimony of Benjamin Reisman, the taxi driver, is con-

firmatory of the other testimony regarding his part in the fraud. Benjamin Laulicht corroborates his brother Daniel.

As to this Yellow Taxicab fraud, we have the Laulichts on one hand claiming respondent as a willing participant, conspiring and arranging the details in anticipation of inquiry on the part of the defendant; on the other hand, we have the respondent disavowing all knowledge of the fraud and picturing himself a victim of Laulicht's machinations. We quote from the report of the referee: " Which of them is to be believed? A self-confessed rascal, who was then serving a sentence upon plea of guilty of a fraud? Or a lawyer, who, by the testimony of several witnesses was of good standing and repute?

" After much weighing of the evidence pro and con, I have reached the conclusion that the convict told the truth and that the respondent was guilty of unprofessional conduct in being a party to the fraud in question."

This court is thoroughly familiar with the capabilities of the Laulichts in " framing " cases. Their methods of operation and the part played by attorneys in assisting them to perpetrate their frauds have been considered by this court on other occasions. (See *Matter of Sprung*, 229 App. Div. 501; *Matter of Kopleton*, Id. 111; *Matter of Katz*, Id. 103; *Matter of Cohen*, Id. 478.)

The referee in his report said: " A fraud of obtaining money by means of four plaintiffs claiming damages never sustained in a collision, which never occurred, could not be carried out without the aid of a lawyer. Would the concocter of such a plot be likely to use a lawyer, whose eyes he must blind as well as those of the defendant, a lawyer who might discover the plot before its consummation and if he were an honest man denounce the concocter? Or would he be more likely to employ one, whose mouth he could seal by making him a co-conspirator? These men of the underworld are shrewd in their way. There was nothing to fear from any source but an honest lawyer acting in good faith for dishonest persons."

After consideration of the testimony, the referee reached the conclusion that he could not credit respondent's denial of complicity in the fraud in the Yellow Taxicab case. In reaching this conclusion, the referee took into consideration respondent's testimony in the Scheiner case as well.

In these proceedings where the Laulichts have been shown to be the leaders, this court has placed no credence on their testimony alone. A review of the entire record now before us convinces us that respondent well knew the character of the Laulichts, knew what they were doing, conspired with them and played his part in the carrying out of their fraudulent schemes. The Laulichts

used the name "Lewis" on occasion. There is a record of suits instituted in February, 1925, in the name of Dauiel Lewis and Benjamin Lewis against Abe Rubin. Respondent is the attorney of record for the plaintiff. He testified that his name was used without his authority. He was put upon inquiry, however, when the attorney for the defendant asked for the index number, and when the answers came into his office. In March, 1925, he signed stipulations discontinuing the actions. His testimony as to why he signed such stipulations is as follows: "After they [the Laulichts] explained it, I thought it over and I thought I better not go through with this, I had better discontinue this, I was not going to appear in a case where I originally was not retained, I thought if they had a meritorious claim I didn't want any money out of it, and they took it up with the company themselves, I didn't want anything to do with it." There was produced the report of Dr. Philip Lehman showing that respondent attended the medical examination of the "Lewises" at respondent's office on March 2, 1925. Dr. Lehman is dead, but his report was authenticated in the same manner as was Dr. Bell's in the Scheiner case.

In March, 1925, respondent was named as attorney of record for Benjamin Lewis and Daniel Lewis in their actions against Kofsky & Cassell, copartners trading as Victory Moving and Trucking Company, and Sheeran, as receiver of the New York Railways Company. Respondent admits these actions were instituted with his authority, and he continued to act as attorney until September, 1925, when another attorney was substituted and settled the actions.

We are satisfied that respondent participated in the frauds in the Yellow Taxicab cases, as found by the referee. His whole connection with the Laulichts shows that he was no innocent victim of their machinations, but a ready and willing agent and tool.

Upon the whole record, we think the respondent is unfit to remain a member of the bar, and has demonstrated the absence of those qualities without which he should not be permitted to remain therein. While the Scheiner case may be said to be not proven, and it was impossible to obtain evidence of solicitation in his sudden outburst of successful business, there are elements of evidence even in those charges which show his general unfitness to practice. There can be no reasonable doubt of his guilt as to the statement of false addresses for the plaintiffs in the Municipal Court actions or as to his guilty participation in the Yellow Taxicab fraud.

The respondent should be disbarred.

FINCH, MCAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.