WOLF STREET SUPERMARKETS, INC., Doing Business as JIM'S BIG M, Respondent, v FRANCIS MCPARTLAND et al., Appellants.

Fourth Department, April 5, 1985

**APPEARANCES OF COUNSEL**

*Belson, Connolly & Belson* (*Gene M. J. Szuflita* of counsel), for appellants.

*Hancock & Estabrook* (*David Peebles* of counsel), for respondent.

**OPINION OF THE COURT**

SCHNEPP, J.

This action arises from the conduct of the defendants in picketing a supermarket owned and operated by plaintiff and in distributing handbills for the avowed purpose of inducing potential customers to boycott the store. Defendants appeal from a judgment entered upon a special verdict awarding plaintiff a total of $62,000 compensatory damages and $50,000 punitive damages on its cause of action for tortious interference with business relations, and $125,000 compensatory damages, $100,000 of which was attributable to lost profits, and $50,000 punitive damages on its cause of action for libel.

Prior to plaintiff's acquisition of the supermarket, which is described as located in a "heavily unionized" neighborhood, the

store had been owned and operated for 11 years by Anthony Pento, as Pento's Big M, an independently owned and operated franchise of P & C Food Markets through its subsidiary, Big M Supermarkets. Pento employed some of the individual defendants and had a collective bargaining agreement with the defendant union. In December 1980 he went out of business and transferred the store assets to P & C. Thereafter, plaintiff obtained the franchise and reopened the market on January 11, 1981 as Jim's Big M.

Plaintiff hired approximately 25 employees but for various reasons made a policy decision not to hire any of Pento's former employees. A union representative contacted plaintiff to persuade him to recognize the union as the representative of his new employees and to hire Pento's former employees but plaintiff did not accede to either request. When it became apparent that plaintiff did not intend to hire any of the former Pento employees, defendants reached the decision to picket plaintiff's store beginning with the morning of its advertised grand opening. Picketing in fact commenced on January 11, 1981. Each of the individual defendants admitted participating in the picketing and all were paid by the union. At some point after the picketing commenced, plaintiff filed an unfair labor practice charge with the National Labor Relations Board (NLRB) alleging unlawful recognitional picketing. Thereafter, on February 13, the picketing ceased.[1] However, on February 17, 1981, defendants reappeared outside the store and passed out handbills which were admittedly composed and printed by the union at its offices. In the first handbill which was distributed it was charged that "Pento's Big M was forced out of business by the Big M Company. All of our jobs were taken away when Big M reopened the store with all non-union labor" and contained the admonition "Boycott Jim's Big M. Help us get back to work." A later handbill charged that "We have been thrown out of work because Jim's Big M discriminates against union members * * *

---

1. On January 19, 1981, defendants filed a NLRB complaint against plaintiff charging it with discriminating against the former Pento employees because of their union membership in violation of the National Labor Relations Act. The complaint was based on Pento's statement to various of the defendants to the effect that P & C told him that they were going to close the store because "It couldn't survive as a union store". In a decision dated March 26, 1982, a NLRB administrative law judge recommended the dismissal of the union's NLRB complaint against the plaintiff finding that there was no violation of Federal labor law in the failure of Jim's Big M to hire any of Pento's employees. These conclusions were confirmed in a decision of a three-member NLRB panel which found no prima facie case of antiunion discrimination on the part of plaintiff.

Jim's Big M has violated the federal laws by discriminating against us on account of our union membership. Don't patronize a labor law violator. Don't encourage unfair labor practices. Don't shop at Jim's Big M. Help us get our jobs back. Boycott Jim's Big M." The handbills were handed out until March 14, 1981 to anyone trying to enter or exit the store. Handbills were also attached to cars entering the parking lot and copies were disseminated at a nearby manufacturing plant.

In its complaint plaintiff alleged four causes of action including intentional interference with business relations, malicious prosecution, defamation and intentional destruction of property.[2] At trial defendants moved for a directed verdict on the first cause of action on the grounds that the conduct proved by plaintiff was constitutionally protected and that plaintiff's claim was limited to recovery of damages proximately caused by violence or threats of violence which, despite a showing that some minor acts of violence occurred, plaintiff had failed to prove. The trial court denied the motions on its view "that there is an independent cause of action not preempted if tort laws of this state are violated" and submitted to the jury a special verdict sheet which called for the jury to determine whether each of the defendants "intentionally and improperly attempted to interfere with plaintiff's relation with its actual and prospective customers."

Defendants argue that picketing to induce potential customers to boycott plaintiff does not subject them to liability for tortious interference with business which may only be imposed where the picketing is accompanied by violence or intimidation, and then only if the violence or threat of violence is the "dominant force" overshadowing the peaceful picketing. They contend that the measure for determining liability is not whether the conduct was "improper" but whether the conduct involved "wrongful means" such as violence or threats. In short, they argue that picketing and other conduct to promote a boycott is protected under the 1st Amendment so long as the picketing was peaceful.

Unquestionably, peaceful picketing on public property enjoys a measure of constitutional protection under the 1st Amendment. The right to picket, however, is subject to greater regulation than pure speech. It would appear that defendants here were engaged in recognitional picketing to coerce plaintiff into bargaining with the union or at least into hiring union members

---

2. We are concerned with only the first and third causes of action for intentional interference with business relations and libel.

formerly employed by Pento's Big M. Congress has declared that recognitional picketing is, in many situations, unlawful and constitutes an unfair labor practice which may be enjoined. For a time in the 1940's such picketing was thought to be assimilated with protected speech, but the Supreme Court has held that recognitional picketing contains elements of economic coercion beyond pure speech and is subject to regulation designed to shelter inside employees from coercion in the choice of a bargaining representative (*Building Serv. Union v Gazzam,* 339 US 532; *see generally,* Gorman, Basic Text on Labor Law Unionization and Collective Bargaining, at 220-222). The Supreme Court recently restated the principle that even peaceful picketing by labor unions may be restricted to protect employees and others " 'from coerced participation in industrial strife' " despite the incidental regulation of the union's freedom of expression (*National Assn. for Advancement of Colored People v Claiborne Hardware Co.,* 458 US 886, 912).

However, we need not decide whether the defendants here have constitutional immunity from liability for tortious interference with business relations arising out of peaceful picketing, since plaintiff claims damages for recognitional picketing and State tort law in this area is largely preempted by Federal labor law. Plaintiff insists that the defendants were engaged in unlawful recognitional picketing in violation of National Labor Relations Act § 8 (b) (7) (C) (29 USC § 158 [b] [7] [C]) which prohibits recognitional picketing as an unfair labor practice unless a petition is filed by the union to obtain certification within a reasonable period of time not to exceed 30 days from the commencement of picketing. Although the record is not clear as to the disposition of the unfair labor practice charges plaintiff filed with the NLRB, the Board clearly has jurisdiction over recognitional picketing by nonemployees (*see generally,* Gorman, Basic Text on Labor Law Unionization and Collective Bargaining, at 222-239).

The Supreme Court has frequently provided guidance in deciding preemption cases in the context of the Federal labor laws. The primary test was enunciated in *San Diego Unions v Garmon* (359 US 236), which like the instant case involved recognitional picketing by a stranger union. "[W]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by §7 of the National Labor Relations Act, or constitute an unfair labor practice under §8, due regard for the federal enactment requires that state jurisdiction must yield" (*supra,* at p 244). The purposes of preemption are to avoid conflicting regulation over substantive law and to protect the

exclusive and primary jurisdiction of the NLRB (*see, Operating Engrs. v Jones,* 460 US 669; *Motor Coach Employees v Lockridge,* 403 US 274; *Campbell v McLean Trucking Co.,* 592 F Supp 1560, 1562-1563).

Defendants' conduct was arguably protected or prohibited under the NLRB so we begin with the presumption that State tort law is preempted and the matter is one within the exclusive jurisdiction of the NLRB. However, preemption is only presumed and in an appropriate case the State courts may be revested with jurisdiction. *Garmon (supra)* and its progeny establish that the presumption may be overcome and the States are not required to yield jurisdiction when the conduct touches concerns deeply rooted in local feelings or responsibilities, or the proposed State regulation of that conduct would implicate the concerns underlying the Federal labor laws only peripherally (*see, e.g., Operating Engrs. v Jones,* 460 US 669, *supra*).

"The paradigmatic example of a case wherein the challenged conduct touches concerns deeply rooted in local feeling and responsibility is an action to enjoin or to recover compensation for violent or threatened violent picketing" (*Palm Beach Co. v Journeymen's & Prod. Allied Servs. of Am. & Canada Intl. Union,* 519 F Supp 705, 713; *see, e.g., Mine Workers v Gibbs,* 383 US 715, 729). "[T]he permissible scope of state remedies in this area is strictly confined to the direct consequences of such conduct and does not include consequences resulting from associated peaceful picketing" (383 US, at p 729). Thus, it is clear that "[w]here the consequences of peaceful and violent conduct are separable * * * recovery may be had only for the latter" (*supra,* at p 732) and that where the consequences cannot be separated recovery may be had only if the violent conduct was so pervasive that the proof "might support the conclusion that *all* damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered" (*supra,* at p 732; emphasis supplied). Absent proof of more than isolated or sporadic incidents of violence or of damages proximately linked to specific conduct, claims for tortious interference with contractual relations have been repeatedly dismissed as preempted (*see, e.g., Falls Stamping & Welding Co. v International Union, United Auto. Workers,* 744 F2d 521; *Billy Jack For Her v New York Coat, Suit, Dress, Rainwear & Allied Workers' Union,* 511 F Supp 1180 [applying New York law]; *see also, Jou-Jou Designs v International Ladies' Garment Workers' Union,* 94 AD2d 395, *affd* 60 NY2d 1011).[3]

---

**3.** In *Jou-Jou,* the First Department held that a claim based even on extreme violence must satisfy the detailed pleading and proof requirements of

■ In our view, plaintiff failed to establish a prima facie case that the sporadic and isolated incidents of harassment which occurred during the first few days of the picketing, and which were attributable for the most part only to the defendant McPartland, resulted in any damage to its business. The record shows that the one customer tripped by McPartland as she attempted to enter plaintiff's store was not deterred from shopping and she continued to patronize plaintiff's supermarket. There is no proof that violence or the fear of violence dominated the picketing or that any damage resulted from the specific acts of violence which occurred or from fear engendered by violence. Defendants' motions for a directed verdict should have been granted and plaintiff's first cause of action for interference with business relations should have been dismissed.

The union's campaign against plaintiff encompassed two distinct phases. From January 11 until February 13 the defendants picketed in front of plaintiff's store. Plaintiff's first cause of action for interference with business relations, although it encompassed to some degree the later handbilling, was based primarily on the picketing and other conduct which occurred during this period of time. The second phase of the campaign commenced on February 17 and lasted until March 14 and consisted of the distribution of hundreds of handbills. In connection with the handbilling plaintiff asserted a cause of action for libel alleging damages through loss of business, goodwill and reputation.

It is recognized that labor disputes "are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions" (*Linn v Plant Guard Workers,* 383 US 53, 58). Such expressions made during a labor dispute, even in the most pejorative terms, are protected under Federal law (*Thomas v Flavin,* 58 AD2d 1031). Nevertheless, although the use of abusive and inaccurate statements is to some degree protected in order to preserve "the Federal interest in permitting and encouraging free and open debate in the context of labor negotiations and disputes" (*Eden Park Health Servs. v Ottley,* 87 AD2d 967), the preemption is only partial. Defamation is merely a peripheral concern of the Federal labor laws provided the State remedy is limited "to those instances in which the complainant can show that the defamatory statements were circulated with

Labor Law § 807 in order for plaintiff to "recover damages resulting therefrom" (94 AD2d 395, 404). We do not reach this question, however, since whether this claim was properly pleaded is not among the issues raised on appeal.

malice and caused him damage" (*Linn v Plant Guard Workers*, 383 US 53, 65, *supra*). In short, State remedies apply "if the complainant pleads and proves that the statements were made with malice and injured [it]" (*supra*, p 55).

The *Linn* court expressly adopted the malice standard previously enunciated in *New York Times Co. v Sullivan* (376 US 254). Thus, "[i]t is clear that a defamatory statement made during the course of a labor dispute is actionable only if circulated with actual malice, i.e., 'with knowledge of its falsity, or with reckless disregard of whether it was true or false' " (*Montana v Smith*, 92 AD2d 732). "In addition to this requirement, the [*Linn*] court made it clear that it was also necessary to allege actual or special damage * * * In so holding, the court demonstrated its disapproval of the rule of defamation per se in the context of labor disputes, a New York rule which presumes injury" (*Eden Park Health Servs. v Ottley*, 87 AD2d 967, *supra*). Thus, in addition to proof of actual malice, there must be proof of actual or special damages. Moreover, a defamed party in a labor dispute is not entitled to punitive damages in the absence of a showing of either actual or special damages (*Linn v Plant Guard Workers*, 383 US 53, 66, *supra*).

Special damages, as the term is used by New York courts, are defined as the loss of something having economic or pecuniary value such as loss of profits (*see, Hogan v Herald Co.*, 84 AD2d 470, 480, *affd* 58 NY2d 630; *see also*, Restatement [Second] of Torts § 575). "While special damages as so defined are included in the term actual damages" the Supreme Court has not limited actual damages to out-of-pocket or pecuniary damage (*Hogan v Herald Co.*, *supra*, pp 480-481). " 'Indeed, the more customary types of *actual* harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering. Of course, juries must be limited by appropriate instructions, and *all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury*' " (*Hogan v Herald Co.*, *supra*, p 480, quoting *Gertz v Robert Welch, Inc.*, 418 US 323, 350; *see also, Linn v Plant Guard Workers*, 383 US 53, 65, *supra;* Restatement [Second] of Torts § 621). A corporation cannot suffer personal humiliation or mental anguish but it can be actually damaged through injury to its reputation in the community regardless of whether it can also demonstrate special damages (*see generally, Ruder & Finn v Seaboard Sur. Co.*, 52 NY2d 663, 670-671; 2 NY PJI 87 [Supp]; Restatement [Second] of Torts § 561).

Here, plaintiff could have established actual damage in two ways. It could have shown by direct testimony from persons in the community that the statements were understood by them to impeach the plaintiff's integrity or business methods causing them to shop elsewhere. On the other hand, general actual damage to reputation may be inferred from proof of special damage.

■ The Trial Judge for the most part correctly instructed the jury on libel under the *Linn-New York Times Co.* standard.[4] The jury returned a special verdict finding that defendants defamed plaintiff by maliciously creating "and/or" distributing handbills containing false statements of fact. These findings are clearly supported by the evidence and should be affirmed.

■ Plaintiff attempted to prove its damages through proof of lost profits and did not adduce direct evidence of damages to its reputation. The general rule governing the recovery of lost profits in tort cases is that damages proximately caused by the wrongful conduct of the defendant may be recovered if plaintiff proves them with reasonable certainty and without speculation (*see, Steitz v Gifford,* 280 NY 15, 20; *Dunlop Tire & Rubber Corp. v FMC Corp.,* 53 AD2d 150, 154-155; *Paduano v State of New York,* 203 App Div 503, 505; *see generally,* Dunn, Recovery of Damages for Lost Profits § 3.4, 35 NY Jur, Libel and Slander, § 174). In our view plaintiff's proof met this test. While this was a new business from plaintiff's perspective, it was actually a continuation of the same business which had operated for many years as Pento's Big M. The proof included Pento's sales over the previous decade, plaintiff's actual sales and P & C's projections for this store as well as sales data concerning other Big M stores in the area. The jury had an adequate basis to find damages based on lost profits. However, there were several possible causes of the damage and the jury should have been instructed to differentiate between damage proximately linked to the libel as opposed to the picketing. The trial court erroneously instructed the jury not to apportion plaintiff's lost profits between the two types of conduct, but to attribute *all* such damages to either the business interference or the libel. The jury attempted to follow these directives and on the special verdict sheet it indicated lost profits of $100,000, all of which was attributed to

---

4. The court erroneously instructed the jury that plaintiff only had to show the requisite malice by a fair preponderance of the evidence. A defamation plaintiff has the greater burden of showing malice with "convincing clarity" (*Montana v Smith,* 92 AD2d 732; *Bee Pub. v Cheektowaga Times,* 107 AD2d 382). The error, however, was not preserved for appeal (CPLR 4110-b, 5501 [a] [b]; *Rupert v Sellers,* 50 NY2d 881, *cert denied* 449 US 901).

the libel. The jury also awarded plaintiff $25,000 general damages for libel which indicates the jury believed that the plaintiff's reputation was directly and actually damaged by the libel. On this record, it is difficult to see how the jury could have apportioned this damage between picketing and handbilling. Plaintiff made no attempt to prove its business losses according to these categories, and, therefore, even if the jury had been properly instructed, the damage awarded for libel may have compensated plaintiff for the consequences of the picketing. In any event, the court's charge on damages was confusing and steered the jury away from making whatever apportionment the evidence might have permitted.

The proof at the trial was sufficient to permit the jury to conclude that plaintiff suffered a loss of business due to the defendants' total conduct. While it is clear that some of its loss of customers resulted from defendants' picketing, it is also apparent that some of its loss may have been occasioned by defendants' libelous handbilling. However, no credible evidence proximately related any loss of profits to the handbilling. It is clear that plaintiff was libeled and suffered harm and it should be granted the opportunity to establish its damage. It is possible that upon a new trial limited to damages in which the proper rules regarding the assessment of damages are appreciated and adhered to by the parties and the court, the plaintiff may be able to establish actual damage to its reputation and the proportion of its lost profits, if any, attributable to the libel. We think that an opportunity should be afforded it to do so (*see, 487 Elmwood v Hassett,* 107 AD2d 285; *Borne Chem. Co. v Dictrow,* 85 AD2d 646, 651).

Accordingly, the cause of action for tortious interference with business relations should be dismissed, and, inasmuch as plaintiff established that defendants defamed plaintiff, the judgment in the cause of action for libel should be modified by deleting the award of damages and the case remitted for a new trial limited to proof of actual and special damages proximately caused by the handbilling and punitive damages relating to this cause of action.

DILLON, P. J., DOERR, DENMAN and BOOMER, JJ., concur.

Judgment unanimously modified, on the law, and as modified, affirmed, without costs, and matter remitted to Supreme Court, Onondaga County, for a new trial on the issue of damages on the third cause of action, in accordance with opinion by Schnepp, J.