HELEN WILSON, Respondent, v MARTIN BODIAN, Appellant, et al., Defendant.

Second Department, August 10, 1987

222

**APPEARANCES OF COUNSEL**

*LeBoeuf, Lamb, Leiby & MacRae (Michael A. Ellenberg* and *Ellen August* of counsel), for appellant.

*Cooper, Brown & Behrle, P. C.,* for respondent.

**OPINION OF THE COURT**

SPATT, J.

This case presents for our consideration the admissibility of physicians' office records pursuant to the "business records" exception to the hearsay rule.

### THE TRIAL

The plaintiff Helen Wilson consulted a Dr. Hyman, an ophthalmologist, in late 1979 and early 1980 with complaints concerning a growth on her left eyelid. This growth had existed for approximately three years prior to that time and had grown larger. Dr. Hyman saw the plaintiff a number of times before referring her to Dr. Colebrenner, a dermatologist, and to the defendant Dr. Martin Bodian, an ophthalmological plastic surgeon. The plaintiff acknowledged that, prior to seeing Dr. Bodian, another doctor had recommended that the growth be removed. She first saw Dr. Bodian in April 1980

and he diagnosed the growth on the plaintiff's eyelid to be either cancerous or precancerous and recommended that it be surgically removed. According to Dr. Bodian, he did not consider taking a biopsy of the growth because it was his opinion, from his visual inspection, that it would have to be surgically removed regardless of the results of the biopsy, and he did not wish to subject this patient of advanced years to the trauma of the biopsy procedure. He did concede, however, that if the growth was not malignant, the surgery would have been less radical.

The surgery to remove the growth was performed by Dr. Bodian at the Brookdale Hospital Medical Center on June 6, 1980. After the initial operation, three additional corrective surgical procedures were performed on the plaintiff's left eyelid; two by Dr. Bodian and one by a Dr. Hornblass. Following the surgical procedures and after Dr. Bodian's involvement ceased, the plaintiff continued to see Dr. Hyman, the original treating ophthalmologist.

In this medical malpractice action against Dr. Bodian and the Brookdale Hospital Medical Center, the plaintiff alleged, essentially, that Dr. Bodian was negligent in failing to perform certain presurgical diagnostic procedures which would have avoided what the plaintiff contended was unnecessary surgery. She maintained that as a result of the medical malpractice, namely, the unnecessary surgery, she suffered needless mutilation, has constant tearing in her left eye, and is unable to completely close the eye. The plaintiff's theory at trial was that the initial surgery was unnecessary because the growth was not cancerous but was a condition known as actinic keratosis, a premalignant ailment which was allegedly susceptible to conservative treatment rather than the radical surgery performed. Her principal contention was that Dr. Bodian was negligent in failing to perform a biopsy or in discovering whether one had previously been performed which would have revealed a condition not requiring surgery. Crucial to the plaintiff's case was her contention that had he performed a biopsy prior to surgery, Dr. Bodian would have discovered the nature of the growth to be actinic keratosis rather than a malignancy, and, with this knowledge, he should not have performed such extensive surgery.

In support of this contention, the plaintiff called Dr. Vivian Boniuk, an ophthalmologist, who testified that accepted medical practice required that a "definitive tissue diagnosis must be made before the contemplated surgery is done". She fur-

ther stated that if a diagnosis of actinic keratosis is made, the accepted method of treatment is to burn it off or by local excision, which would have prevented the radical surgery resulting in the mutilation and injury to the eye caused by Dr. Bodian's operation. On the other hand, Dr. Bodian testified that even if a biopsy had been done which revealed the condition to be actinic keratosis, this knowledge would not have affected his decision to surgically remove the growth. He conceded, however, that if he knew the tumor was benign he would have removed less tissue.

Another disputed issue material to the plaintiff's case on damages was whether and to what extent the plaintiff had suffered from tearing in her left eye prior to the surgery. As a major item of her damages, she contended that the unnecessary surgery caused the tearing, while it was Dr. Bodian's position that the plaintiff's tearing condition predated the surgery. Thus, two key issues of fact presented were (1) whether a biopsy should have been performed on the growth on the plaintiff's eyelid prior to the initial surgery, and (2) whether the plaintiff suffered from tearing in the affected eye prior to the surgery. Dr. Hyman was a material witness with regard to both issues and did not testify.

■ At the trial, the plaintiff sought to introduce into evidence the office records of Dr. Hyman. When the trial court inquired as to why Dr. Hyman was not available to testify in person, the plaintiff's counsel stated, "I've subpoenaed him, Your Honor, and he has not shown". Neither the process server nor any other witness nor any affidavit of service was produced to verify the unavailability of Dr. Hyman. Through Bernice Sorkin, an employee of Dr. Hyman whose specific duties ·were not revealed, the plaintiff's counsel attempted to lay a foundation for the introduction of Dr. Hyman's records into evidence as business records. Although the testimony of Ms. Sorkin did not follow the required statutory litany as set forth in CPLR 4518 (a), no objection was made by Dr. Bodian's counsel on the ground of an inadequate foundation. Therefore, the defendant Bodian waived the "foundation" objection (see, Flynn v Manhattan & Bronx Surface Tr. Operating Auth., 61 NY2d 769; Horton v Smith, 51 NY2d 798; Sanchez v Kato, Inc., 115 AD2d 646; CPLR 4017; 4 Weinstein-Korn-Miller, NY Civ Prac ¶ 4017.05). The objections to the introduction of Dr. Hyman's office records were (1) that the records were irrelevant, and (2) that "[t]here are conclusions and statements contained in those records, the jury is going to be asked to

make inferences from that, and I cannot cross-examine those records", which was, in effect, a hearsay objection.

Dr. Hyman's office records consisted of five pages, of which the first page was partially typewritten and the balance was in handwritten notations and sketches. As previously noted, the gravamen of the plaintiff's case against Dr. Bodian was that the growth on her eyelid was a condition known as actinic keratosis rather than a malignancy, which condition did not require radical surgery but was susceptible to more conservative treatment. Since Dr. Bodian conceded that he did not seek to have the growth biopsied, a significant issue arose during the trial as to whether a biopsy had previously been performed at Dr. Hyman's request. The plaintiff also contended that if Dr. Bodian had consulted with Dr. Hyman, he would have learned that a biopsy had indeed been performed and that a diagnosis of actinic keratosis had been made. The plaintiff's case was, therefore, enlarged to include the theory that a biopsy had been taken which revealed the condition to be actinic keratosis, and that, therefore, conservative treatment rather than surgery would have been the accepted standard.

Dr. Hyman's office records contained the following entry dated April 15, 1980: "BX nose lesion—keratosis". The plaintiff's attorney sought to elicit testimony as to the meaning of this abbreviation and term. He did not attempt to obtain an interpretation of this term by his own medical expert but, rather, did so by questioning the defendant Dr. Bodian and Dr. Bernard Kronenberg, the appellant's medical expert. During cross-examination of Dr. Bodian, the following occurred:

"Q. What is [sic] BX mean in a hospital chart or a medical office record?

"A. DX?

"Q. B as in boy?

"A. BX?

"Q. Yes.

"A. I'm not familiar with the abbreviation.

"Q. Is it ever used to indicate biopsy?

"A. I never do.

"Q. What do you use?

"A. Biopsy, straight * * *

"Q. When Mrs. Wilson visited your office, were you aware of any previous biopsies on the growth of Mrs. Wilson's nose?

"MR. FADER [attorney for the defendant Bodian]: Objection, your Honor.

"THE COURT: I'll allow that.

"A. No, I was not aware of any such biopsy having been taken.

"Q. Did you call doctor—the referring physician, Dr. Hyman, to check to see if a biopsy had been done?

"A. I don't recall making such a request of him. I just don't recall * * *

"Q. I'd like to read to you the entry that is on that card under the date April 15, 1980.

"MR. FADER: Your Honor, I object.

"THE COURT: On what ground?

"MR. FADER: We are getting very far afield. It is improper cross, and has nothing to do with the issues in this case.

"THE COURT: I really don't know what it says. I'll allow it, this is cross examination.

"MR. LATIMER [the plaintiff's attorney]: It says 'BX, nose lesions live—keratosis'.

"THE COURT: Yes, I see that. I presume, as you told me, BX means biopsy. I see that here.

"Q. Does that indicate to you that a biopsy was done—

"MR. SCHWARTZ [attorney for the defendant hospital]: Objection, your Honor.

"MR. FADER: Objection, your Honor.

"THE COURT: I'll allow that.

"MR. FADER: The document speaks for itself, and we don't have Dr. Hyman here to interpret.

"MR. SCHWARTZ: Furthermore, the document is hearsay evidence. There's no indication who took it, who read it and who came up with that conclusion * * *

"Q. Doctor, does that indicate to you that a biopsy was taken and the result of that biopsy entered into this record and that the biopsy showed keratosis?

"MR. FADER: Objection.

"MR. SCHWARTZ: Objection.

"THE COURT: I'll allow it.

"A. All this indicates to me is that an inscription was written on this card which states a biopsy was taken of the nose lesions and there was keratosis. I have no further under-

standing or knowledge of what was done. I just see the writing here".

The plaintiff's attorney also asked Dr. Kronenberg, the appellant's expert, what he believed the "BX" notation meant.

"Q. If that entry read BX nose lesion—keratosis, would it mean anything to you?

"MR. FADER: Objection to his interpretation of his records.

"THE COURT: I'll allow it.

"A. It would mean that the doctor wrote down he thought it was keratosis.

"Q. What would BX nose lesion mean?

"A. BX nose—

"Q. If it said BX nose lesion, would that mean anything to you?

"A. No. Maybe he meant there's a lesion near the nose".

Undaunted by the somewhat equivocal response of Dr. Bodian and the testimony of Dr. Kronenberg expressing lack of knowledge of the meaning of the "BX" entry, the plaintiff's counsel referred to this entry repeatedly as evidence that a biopsy had been performed and that keratosis was diagnosed prior to the surgery performed by Dr. Bodian. We note, however, that, on direct examination, the plaintiff herself was never asked whether she had undergone a biopsy.

Dr. Hyman's office records and the office records of Dr. Hornblass, a treating physician following the surgery, were also used by the plaintiff to support her position on a material issue as to damages. The plaintiff maintained that her eye did not tear prior to surgery. The plaintiff's counsel again used Dr. Hyman's records, which did not indicate complaints of tearing prior to the operation, and the records of Dr. Hornblass which contained notations of constant postsurgery complaints, to prove that the tearing problem occurred after the operation.

In summation, the plaintiff's counsel commented on the evidence adduced from Dr. Hyman's office records as to the alleged biopsy which showed that the plaintiff was suffering from actinic keratosis rather than a cancerous condition. The plaintiff's counsel pointedly commented to the jury as to the evidence of the prior biopsy, as follows:

"And one of the facts that you may find was available was that there was a biopsy already in the record of her treating physician, Dr. Hyman. You've got Dr. Hyman's records here,

you can look at them yourself. I want you particularly to look at an entry under April 15. Maybe I'll get those now so I can show you where it is.

"When you are deliberating, you will have a chance to look at all these exhibits, and I want you to look in Dr. Hyman's records".

Not only did the plaintiff's counsel emphasize the evidence of the alleged prior biopsy, but he developed the further inference that Dr. Bodian was negligent in not inquiring of Dr. Hyman as to whether a biopsy had been performed. "[H]e can pick up the phone and say, Dr. Hyman, you sent Mrs. Wilson here to look at this growth. Did you. do a biopsy? Do you have any information on it, because maybe I might consider doing a biopsy, maybe not, but if she's already had one done I don't want to do a second one. There is no need for that. He could have called, and we don't know what Dr. Hyman would have said but maybe he would have sent over a copy of his records, so I want you to look at Dr. Hyman's records and consider whether this fear of subjecting Mrs. Wilson to the risk of a biopsy is really an excuse for not taking a biopsy when there was one done".

Also, on the question of damages, the plaintiff's counsel told the jury in summation that Dr. Hyman's office records showed that there was no tearing before Dr. Bodian's surgery. "Dr. Hyman's records don't indicate any tears before the surgeries. Look for yourself because you will see that there's notations of tearing by Dr. Hyman in his records when he saw Mrs. Wilson after she saw Dr. Bodian. Look in Dr. Hornblast's [sic] records. There are notations there of constant tearing. They show up".

The jury returned a verdict against the defendant Bodian in the sum of $100,000. On this appeal, the defendant Bodian seeks reversal on two grounds. First, he contends that the office records of Dr. Hyman and Dr. Hornblass were erroneously admitted. In particular, he objects to three notations in the office records of Dr. Hyman; namely, (1) the "BX nose lesion—keratosis"; (2) "Had large area removed [with] flap—poor result"; and (3) "2° [second] repair unsuccessful". Second, the defendant Bodian contends that the refusal of the trial court to give a "missing witness" charge with respect to Dr. Hyman and Dr. Hornblass was prejudicial error.

### ADMISSIBILITY OF PHYSICIANS' OFFICE RECORDS

We begin with the premise that as out-of-court declarations

offered for their truth, Dr. Hyman's office records are hearsay documents and inadmissible unless they fall within an exception to the hearsay rule. In this case, we are concerned with whether Dr. Hyman's records qualify under the "business records" exception to the hearsay rule *(see,* CPLR 4518 [a]).

Initially, when we consider the business records rule, we must do so in the light of the extensive recent review of that rule in *People v Kennedy* (68 NY2d 569). In *Kennedy,* Judge Kaye, speaking for the unanimous court, stated that the courts are utilizing the business records rule in an ever-increasing manner. Many different kinds of records, however prejudicial or determinative of the factual issues, are being increasingly admitted under the "business records" rule. Judge Kaye recognized this development: "Since that enactment nearly 60 years ago, the statutory exception to the hearsay rule has widened considerably, both as business and record-keeping have become increasingly complex and sophisticated. The business records exception has been recognized as probably the most important hearsay exception, and a major growth point in the law with great potential for further expansion (5 Weinstein-Korn-Miller, NY Civ Prac ¶¶ 4518.01, 4518.02)" *(People v Kennedy, supra,* at 578).

In considering the admissibility of physicians' office records, we must distinguish between different types of medical records such as hospital records, physicians' office records and physicians' medical reports. These three different types of records must be treated separately as to admissibility. Some decisions have intermingled these different types of records, which has led to some conflicting results. Since it is the business of a hospital's staff "to diagnose and treat its patients' ailments" *(Williams v Alexander,* 309 NY 283, 287), entries made in a hospital record relevant to diagnosis and treatment qualify for admission as prima facie evidence of the facts contained in the record under a statutory business records rule (CPLR 4518 [a]), and special statutory provisions (CPLR 4518 [c]; 2306).

Hospital records, which have been specifically addressed by the Legislature *(see,* CPLR 4518 [c]; 2306), and are routinely admissible by certification under those statutes, must be distinguished from physicians' office records. A further distinction must be drawn between physicians' office records and physicians' *reports.* Doctors' reports are often prepared at the request of counsel on behalf of the parties. Such reports are generally material prepared for litigation and are not the

systematic, routine, day-by-day type of records envisioned by the business records exception *(see, People v Kennedy, supra,* at 579). Therefore, physicians' reports prepared for litigation are generally inadmissible in evidence under the business records exception to the hearsay rule *(see, Sabatino v Turf House,* 76 AD2d 945; *Bilotti v Rosen,* 33 AD2d 790; *Pickering v Freedman,* 32 AD2d 649; *cf., Matter of Katz,* 230 App Div 172).

Cases specifically addressing the admissibility of physicians' office records, unlike those dealing with hospital records, are few and are inconsistent. Some courts have held office records to be admissible. *Jezowski v Beach* (59 Misc 2d 224) involved the admissibility of handwritten "office cards" of a deceased doctor in a negligence case. The doctor's widow identified the office cards which were written in the doctor's handwriting each time he saw the patient. In admitting the records, Justice Cardamone reviewed the transcript of the case of *Duffy v Thomas A. Edison, Inc.* (240 App Div 1002), an affirmance by the Appellate Division, Second Department, without opinion, which involved the admissibility of the records of the plaintiff's deceased attending physician. In discussing the *Duffy* case, Justice Cardamone observed: "The report was signed and dated by the doctor. Such a report, made in the regular course of the doctor's practice in his own handwriting, dated and factual, even though it contains his medical opinion, should be and is admissible. Particularly, as here where it is shown that such a record was made as an essential part of a doctor's professional practice in caring for his patient and also the basis upon which he treated his patients, such a record is admissible. (5 Benders, N.Y. Evidence, § 374.03, pp. 230-234.)" *(Jezowski v Beach, supra,* at 226.)

A physician's records were also held to be admissible in *Hessek v Roman Catholic Church* (80 Misc 2d 410, 412) in which the records of a doctor who was available to testify but whose fee to testify was "outrageous" were held to be admissible as business records except for the medical opinions.

Other cases, however, have held physicians' office records to be inadmissible, because they contain medical opinions. In fact, the courts have exhibited marked reluctance to allow such medical opinions into evidence. In *Goodkin v Brooklyn & Queens Tr. Corp.* (241 App Div 737, *affd* 265 NY 638), an Appellate Division, Second Department case, the records of a deceased physician were found inadmissible, as follows: "Exhibit C for identification was not admissible in evidence. It

contained opinions which were not records of an act, transaction, occurrence or event made in the course of the doctor's profession".

In *Rodriguez v Zampella* (42 AD2d 805), the Appellate Division, Third Department, also held such office records containing opinions to be inadmissible: "First, at the time of the trial, plaintiff's attending physician was totally disabled and could not testify. His nurse appeared with the doctor's records containing the history, injury, diagnosis and the care and treatment rendered to plaintiff for this accident. They were marked for identification, offered and, over objection, received in evidence as records kept by the doctor in the ordinary course of his business (CPLR 4518, subd. [a]). Since the doctor's opinion and diagnosis were woven into his notations on these records, constituting his medical report, the evidence offered consisted of expert proof and should not have been admitted as evidence in chief".

While this court at one time expressed a contrary view, we have recently held in *McClure v Baier's Automotive Serv. Center* (126 AD2d 610) and now reaffirm that a physician's office records, supported by the statutory foundations set forth in CPLR 4518 (a), are admissible in evidence as business records. Similar to hospital records, it is the business and duty of a physician to diagnose and treat a patient's illness. Therefore, entries in the office records germane to diagnosis and treatment are admissible, including medical opinions and conclusions. In this regard, the entries in Dr. Hyman's office records "Had large area removed [with] flap—poor result" and "2° [second] repair unsuccessful" were both opinions germane to treatment and diagnosis and were properly admitted.

We now turn to the third specific notation at issue: namely, "BX nose lesion—keratosis". Generally, business records need not take any particular form to be admissible and can consist of marks, figures or symbols. "Any record designed to retain information and otherwise possessed of the characteristics of a business record should be admitted under the rule regardless of the form which the record takes" (5 Bender, New York Evidence § 372.04, at 225; *see, e.g., Matzell v Distaola,* 105 AD2d 500, *lv denied* 64 NY2d 608 [in which a map was properly admitted as a business record]). In this case, Dr. Hyman's records consisted almost exclusively of short notations, some of which were illegible, and sketches. Where records are illegible or, as here, comprehensible only to the creator, the probative value is minimal or nonexistent *(see*

*generally,* 30 Am Jur 2d, Evidence, § 936; *Campbell v Manhattan & Bronx Surface Tr. Operating Auth.,* 81 AD2d 529). A tape recording that is so inaudible and indistinct that a jury must speculate as to its contents is inadmissible *(People v Ryan,* 121 AD2d 34; *People v Bernstein,* 69 AD2d 907). Similarly, a notation in a physician's office record which is illegible is not admissible *(see, Campbell v Manhattan & Bronx Surface Tr. Operating Auth., supra).*

In this case, given the appellant's failure to object to the deficient foundation testimony, those portions of Dr. Hyman's office records which were germane to diagnosis and treatment and were legible were properly admissible in evidence as business records. However, with regard to the "BX" entry, we encounter another problem in that it is a symbol or abbreviation which is not comprehensible to a jury on its face and which must be interpreted. Unlike hospital records, which contain generally accepted and standard medical abbreviations, a physician's office records may contain purely personal abbreviations known only to the physician. In order to admit a medical abbreviation or symbol written by a doctor in his office record, which abbreviation is not within the ken of the jury, in the absence of the physician author, there must be a foundation laid that such an abbreviation has a well-known and accepted meaning in the medical profession. An abbreviation of this kind that is not interpretable as having a definite and accepted meaning is not admissible.

"To be admissible in evidence, however, account books should be precise and definite, and they must be kept in such a manner as to show of themselves the charges and the nature thereof. Account books are not admissible in evidence where they are too confused to be understandable * * *

"The fact that such books contain abbreviations, *where such abbreviations are well known and usual,* does not affect their admissibility, although it has been held that books containing entries principally made up of hieroglyphics and figures to be explained and translated from a table in front of the book, intelligible only to the person who made the entries, are inadmissible" (30 Am Jur 2d, Evidence, § 936, at 56-57; emphasis supplied).

The key notation in Dr. Hyman's office records stressed by the plaintiff during trial and in summation on the issue of liability, "BX nose lesion—keratosis", was the subject of speculation as to its precise meaning. This notation was used by

the plaintiff to prove that a prior biopsy had been performed and that a diagnosis of actinic keratosis had been made. Despite the pivotal importance of this symbol "BX", in the absence of the author there was no underlying proof of its generally accepted meaning in the medical profession. There was no proof that this abbreviation was "well known and usual" in the medical community. Indeed, the two physicians who testified as to the meaning of "BX" differed as to its interpretation. Dr. Bodian initially testified that he was not familiar with the abbreviation and later, after hearing counsel state that "BX means biopsy", changed his initial interpretation. However, there was no evidence adduced that the abbreviation "BX" was an accepted medical term; and, in this regard, we note that the plaintiff called her own medical expert but did not question her on this subject.

There are other evidentiary obstacles to the admissibility of the "BX" notation. Even assuming that the term "BX" does mean biopsy, the source of this notation was undisclosed (see, Rush v Sears, Roebuck & Co., 92 AD2d 1072, 1073). There was no evidence as to who performed the test, when the test was performed or the results of such a test. Perhaps the biopsy data was related to Dr. Hyman by the plaintiff. In addition, if the "BX" notation actually meant that a biopsy had been performed, since Dr. Hyman is an ophthalmologist, it probably constituted a test performed by a unnamed third party. In that event, the procedures that individual used to perform the test and make the diagnosis were unknown, and the scientific reliability of the alleged biopsy could not be explored by the appellant (see, Matter of Brown v Murphy, 43 AD2d 524). All of this critical information could, of course, have been furnished by the purported author of the notation, the missing Dr. Hyman.

In view of the infirmities in the "BX" notation as heretofore stated, any probative value of this notation was greatly outweighed by the appellant's lack of opportunity to test the plaintiff's factual assumption by cross-examination (see generally, Annotation, Evidence—Consulting Physician's Report, 69 ALR3d 104). Therefore, even under the increasing enlargement of the scope of the "business records" rule, the notation as to the "BX nose lesion—keratosis" was inadmissible hearsay.

In sum, although Dr. Hyman's office records were admissible as business records, including the medical opinions contained in the records, the notation "BX nose lesion—kerato-

sis" should have been excluded. This error was exacerbated by the failure to give a missing witness charge as to Dr. Hyman.

### MISSING WITNESS CHARGE AS TO DR. HYMAN AND DR. HORNBLASS

The trial court declined Dr. Bodian's request to give a "missing witness" charge with regard to Dr. Hyman and Dr. Hornblass, who were both treating physicians of the plaintiff. It is well established that the missing witness charge with respect to a treating physician should be given where the witness is under the plaintiff's control and is in a position to give substantial, not merely cumulative, evidence *(Chandler v Flynn,* 111 AD2d 300, *appeal dismissed* 67 NY2d 647). Dr. Hyman's testimony was of vital importance on the issues of liability and damages. As the plaintiff's treating physician prior to the surgery, Dr. Hyman not only could have interpreted the "BX" entry in his office records, but he could have furnished material, relevant and noncumulative testimony including whether a biopsy was performed and its result. In addition, he was the only treating physician who had knowledge as to whether the plaintiff suffered from the tearing condition prior to the surgery.

With respect to the issue of control, this court observed in *Chandler v Flynn (supra,* at 301-302): " 'Control' is used in a very broad sense and includes a witness under the influence of a party as well as one under a party's employment or management *(see, Hayden v New York Rys. Co.,* 233 NY 34; *People v Douglas,* 54 AD2d 515) or one whom it 'may be naturally inferred * * * [is] of good will to the party, such as * * * his physician' *(Reehil v Fraas,* 129 App Div 563, 566, *revd on other grounds* 197 NY 64; *see also, Mashley v Kerr,* 47 NY2d 892). Nevertheless, 'former treating physicians, like former employees, may be neither under the control of the party nor willing to provide testimony favorable to the patient who left them to go to other doctors' *(Oswald v Heaney, supra,* at p 654; *see also, Pagan v Ramirez,* 80 AD2d 848). The burden is on the party *opposing* the inference to show that the witness is not available or under his 'control' *(see, Mashley v Kerr, supra; Grun v Sportsman, Inc.,* 58 AD2d 802; Richardson, Evidence § 92 [Prince 10th ed])."

Dr. Hyman treated the plaintiff prior to Dr. Bodian's

surgery and continued to treat her for more than three years after Dr. Bodian's involvement ceased. There is no indication of any hostility between the plaintiff and Dr. Hyman, whose office assistant testified and produced the plaintiff's records. The plaintiff had the burden of proof to show that Dr. Hyman was not available or under her "control" *(see, Chandler v Flynn, supra,* at 301-302; *Grun v Sportsman, Inc.,* 58 AD2d 802, *supra).* Despite this burden, the plaintiff made no attempt to show the unavailability of Dr. Hyman or his unwillingness to testify other than counsel's unsubstantiated assertion that Dr. Hyman was subpoenaed but failed to appear. No testimony by any process server was ever offered, nor was an affidavit of service produced. Moreover, Dr. Hyman's employee testified for the plaintiff, and her counsel never inquired as to Dr. Hyman's unwillingness to appear or his unavailability. Under the circumstances of this case, Dr. Hyman was a witness who would naturally be expected to give testimony favorable to the plaintiff *(see, Guzman v Manhattan & Bronx Surface Tr. Operating Auth.,* 99 AD2d 972). In light of the plaintiff's failure to demonstrate that Dr. Hyman was unavailable *(see, People v Gonzalez,* 68 NY2d 424), no longer under her control or in any way hostile to her *(see, Chandler v Flynn, supra),* and especially in view of the blanket admission of Dr. Hyman's office records, the trial court should have given a missing witness charge as to Dr. Hyman.

While Dr. Hornblass was also plaintiff's treating physician subsequent to the surgery involved, there is no indication that he was in a position to give noncumulative evidence on any material issue in this case. Dr. Hornblass could be expected to testify only as to the postsurgery tearing and, with reasonable certainty, would not have contributed to a determination as to the time when the tearing commenced since he never saw the plaintiff prior to the surgery. Therefore, the trial court properly declined to give a missing witness charge as to Dr. Hornblass.

In the context of the presentation of this case, the combined erroneous admission of the "BX" notation in Dr. Hyman's office records, its use by the plaintiff's counsel in summation, and the failure to instruct the jury as to the effect of the nonappearance of Dr. Hyman, constitute reversible error. Accordingly, the judgment insofar as it is in favor of the

plaintiff should be reversed, and a new trial should be granted of the plaintiff's action insofar as it is against the appellant.

MOLLEN, P. J., THOMPSON and EIBER, JJ., concur.

Ordered that the judgment is reversed insofar as appealed from, on the law, and a new trial of the plaintiff's action insofar as it is against the appellant is granted, with costs to abide the event.