BLINDS TO GO (U.S.), INC., Respondent, v TIMES PLAZA DEVELOPMENT, L.P., Appellant. [931 NYS2d 105]—

On February 21, 2001, the plaintiff tenant (hereinafter the tenant) and the defendant landlord (hereinafter the landlord) entered into a lease of certain premises in Brooklyn for a period of 10 years, renewable for two additional five-year periods, for the purpose of operating a retail store selling custom-made window blinds. The lease contained a provision that if the tenant closed its business on the property for a period of three months or more, the landlord could elect to "recapture" the premises and rent it to another entity.

By September 2003 the tenant had not opened for business or commenced construction to open for business. By letter dated September 25, 2003, the landlord elected to terminate the lease pursuant to the "recapture" provision. The tenant commenced the instant action challenging the landlord's termination of the lease. By order dated April 2, 2004, the Supreme Court granted the landlord's motion pursuant to CPLR 3211 to dismiss the complaint. The tenant surrendered the keys and possession of

the premises to the landlord. By decision and order dated June 20, 2005, this Court reversed the order dated April 2, 2004, on the ground that, since the tenant never commenced any business operations at the premises, the recapture provision was inapplicable (see Blinds To Go, Inc. v Times Plaza Dev., L.P., 19 AD3d 524 [2005]).

In September 2010 the case proceeded to trial before a jury on the issues of whether the landlord breached the lease and, if so, whether the tenant sustained damages as a result of the breach. The jury found that the landlord breached the lease and that the tenant sustained damages in the principal sums of $16,666.66 for the loss of its security deposit, $16,666.66 for loss of rent and taxes paid for one month, $13,395.03 for the loss of fees, costs, and expenses paid in connection with preparing the store to open, and $3,751,006 for lost profits. In addition, the Supreme Court awarded the tenant $375,000 in legal fees upon a stipulation between the parties that if the verdict were sustained on appeal, $375,000 was a reasonable amount of legal fees pursuant to a provision of the lease which provided that the prevailing party was entitled to legal fees reasonably incurred.

On appeal, the landlord does not challenge the jury's finding that it breached the lease. Although there is no evidence of an actual eviction of the tenant from the premises, the tenant may be entitled to damages resulting from a constructive eviction, which occurs when a tenant relinquishes possession as a result of the landlord's breach of the lease, depriving the tenant of the beneficial use and enjoyment of the premises (see Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77, 83 [1970]; P.W.B. Enters. v Moklam Enters., 243 AD2d 350 [1997]).

The landlord contends that the jury verdict on the issue of damages for lost profits is not supported by legally sufficient evidence. The landlord's contention, however, is unpreserved for appellate review, since it did not raise the issue of damages for lost profits when it moved for judgment as a matter of law at the close of the tenant's case (see Olchovy v L.M.V. Leasing, 182 AD2d 745, 746 [1992]). Nevertheless, the weight of the evidence presented at trial on the issue of damages for lost profits does not support the jury verdict (see Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995]; Nicastro v Park, 113 AD2d 129, 132-133 [1985]). Lost profits may be recoverable for breach of a contract if it is demonstrated with certainty that such damages have been caused by the breach, and the alleged loss is capable of proof with reasonable certainty. There also must be a showing that the particular damages were fairly within the contempla-

tion of the parties to the contract at the time the contract was made (see *Kenford Co. v County of Erie*, 67 NY2d 257, 260 [1986]). In the case of a "new business," there generally "does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty" (*id.* at 261). However, there is no per se rule barring new enterprises from recovering lost profits, so long as lost profits may be established with reasonable certainty (see *Cifone v City of Poughkeepsie*, 234 AD2d 331 [1996]; see also *Staten Is. N.Y. CVS, Inc. v Gordon Retail Dev., LLC*, 57 AD3d 760 [2008]).

The tenant notes that its business, which sells custom-made window blinds directly to the retail customer, was part of a chain. It contends that the performance of four of its stores in the New York metropolitan area provides a basis for comparison (see *Wolf St. Supermarkets v McPartland*, 108 AD2d 25, 33 [1985]). However, although the tenant was not a start-up company (see *Awards.com v Kinko's, Inc.*, 42 AD3d 178 [2007], affd 14 NY3d 791 [2010]), it acknowledged that, when it leased the subject premises, "the Brooklyn market was the market we weren't in at the time." Further, the tenant's expert testified that the store proposed for the subject premises would be "an urban store, not a suburban store," and the only comparable store he examined which could be considered an urban store was the Rego Park store in Queens. The expert acknowledged that there was no parking in front of the proposed store in Brooklyn, and claimed the absence of parking "[m]ight not adversely impact it because," based upon his conversations with the tenant's management, his understanding was that "different standards" were applied to urban stores than suburban stores.

The other purportedly comparable stores which the tenant's expert used to estimate lost profits were suburban stores in Yonkers, Carle Place, and Paramus. When examining demographics, the tenant's expert noted, the median income per household of the areas of these stores varied greatly, with $71,000 annual income per household in the area of Carle Place, and $40,000 per household in Brooklyn and Queens, which actually broke down to annual household income of $41,000 per year in Queens, and $38,000 per year in Brooklyn. He acknowledged that Paramus and Yonkers were "kind of skewing it a bit," because the average income in those areas tended to be much higher.

The expert offered no evidence on the profits of other stores in Brooklyn that sold window blinds, or evidence of profits in the industry in general. The expert concentrated solely on stores

owned by this particular tenant, and acknowledged that he used the stores which the tenant told him were comparable. Thus, the expert did not use independent judgment in reaching his conclusions (*id.* at 185). In light of the tenant's admission that it leased the subject premises to break into a new market, and its own expert's testimony demonstrating the differences between the subject premises and the allegedly comparable stores, the evidence on lost profits was so lacking that the verdict could not have been reached on any fair interpretation of the evidence (*see Miranco Contr., Inc. v Perel*, 57 AD3d 956, 957 [2008]). Consequently, the landlord is entitled to a new trial on the issue of damages for lost profits.

Further, there must be a new trial on the remaining damages because of the improper cross-examination of the landlord's witness, Bruce Orlofsky. On cross examination, Orlofsky was shown a copy of exhibit D, a map annexed to the lease, which had writing at the top indicating a "no build area." The lease contained a provision prohibiting building in the "no build area," which the lease indicated was designated on exhibit D in yellow. Exhibit D, however, did not contain any yellow markings, as only a black and white copy was entered into evidence. Counsel for the landlord objected to this line of questioning, noting that there was no yellow on exhibit D. His objection was overruled. The tenant's attorney sought to elicit testimony that the "no build area" was over a vacant portion of the property, but Orlofsky indicated that the "no build area" referred to the sidewalk in front of the leasehold and not the vacant portion. Orlofsky indicated on cross-examination, after the lease was terminated, the landlord sold the vacant portion of the property to a developer in exchange for $6.5 million dollars, along with one of the condominiums developed on the site. In summation, the tenant's attorney argued that this was the "real reason" the landlord terminated the lease.

The trial court erred in allowing the tenant's attorney to pursue this line of questioning. An original copy of exhibit D showing the yellow markings was never entered into evidence. The copy of exhibit D that was entered into evidence was in black and white and did not contain any yellow markings. Thus, the tenant's questioning of Orlofsky invited the jury to speculate as to the area that was, in fact, highlighted in yellow (*see Wilson v Bodian*, 130 AD2d 221, 232-233 [1987]). This error was further exacerbated by counsel's summation, as there was no evidence to support his argument that the landlord was prohibited from building on the vacant portion of the property and that this was the reason the landlord terminated the lease

(*see Piervinanzi v Textile Motor Express*, 198 AD2d 183 [1993]). These errors had the effect of attributing an improper motive to the landlord for terminating the lease and, thus, prejudiced the landlord. Accordingly, a new trial is warranted.

Since the landlord acknowledges that it breached the lease, the new trial should be limited to the issue of damages, if any, resulting from the breach.

The parties' remaining contentions either are without merit or need not be addressed in light of our determination. Mastro, J.P., Chambers, Austin and Cohen, JJ., concur.